**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| EVELYN D. MEARS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-07-1778 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are Plaintiff Evelyn D. Mears ("Mears") and Defendant Michael J. Astrue's, Commissioner of the Social Security Administration ("Commissioner") cross-motions for summary judgment. Mears appeals the determination of an Administrative Law Judge ("ALJ") that she is entitled to receive Title II disability insurance benefits or Title XVI supplemental security income ("SSI") benefits. *See* 42 U.S.C. §§ 416(i), 423, 1382c(a)(3)(A). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, it is ordered that Mears' Motion for Summary Judgment (Docket Entry No. 14) should be denied, the Commissioner's Motion for Summary Judgment (Docket Entry No. 15) should be granted, and the Commissioner's decision denying benefits be affirmed.

**I.     *Background***

On April 19, 2004, Mears filed an application for disability insurance benefits and SSI benefits with the Social Security Administration ("SSA"), claiming that she had been disabled and unable to work since October 12, 2002.[1]  (R. 10, 71-74).  Mears alleges that she suffers from a

---

[1]  Mears, subsequently, amended her onset disability date to May 23, 2003.  (R. 10).

variety of disabling conditions, including hip pain, diabetes, and arthritis.  (R. 12).  After being

denied benefits initially and on reconsideration, on February 11, 2005, Mears requested an

administrative hearing before an ALJ to review the decision  (R. 10, 17-22, 25, 50-70).

A hearing was held on June 29, 2006, in Houston, Texas, at which time the ALJ heard

testimony from Mears and Kay Gilreath, a vocational expert ("VE").  (R. 378-410).  In a decision

dated September 1, 2006, the ALJ denied Mears' application for benefits.  (R. 10-16).  On October

23, 2006, Mears appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings

and Appeals.  (R. 6).  On March 30, 2007, the Appeals Council denied Mears' request to review the

ALJ's determination.   (R. 3-5).   This rendered the ALJ's opinion the final decision of the

Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Mears filed this case on May 30, 2007,

seeking judicial review of the Commissioner's denial of her claim of benefits.  *See* Docket Entry

No. 1.

## II.    *Analysis*

### A.     *Statutory Bases for Benefits*

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues.

*See* Social Security Administration, Social Security Handbook, § 2100 (14th ed. 2001).

The SSI Program is a general public assistance measure providing an additional resource to the aged,

blind, and disabled to assure that their income does not fall below the poverty line.  *See* 20 C.F.R.

§ 416.110.  Eligibility for SSI is based upon proof of indigence and disability.  *See* 42 U.S.C.

§§ 1382(a), 1382c(a)(3)(A)-(C).  A claimant applying to the SSI program cannot receive payment

for any period of disability predating the month in which she applies for benefits, no matter how long

she has actually been disabled.  *See Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); *see also*

20 C.F.R. § 416.335.  The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application.  If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335.  Thus, the month following an application, here, May 2004, fixes the earliest

date from which benefits can be paid.  (R. 10).  Eligibility for SSI payments, however, is not

dependent on insured status.  *See* 42 U.S.C. § 1382(a).

Social Security disability insurance benefits are authorized by Title II of the Act and are

funded by Social Security taxes.  *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY

HANDBOOK, § 2100.  The disability insurance program provides income to individuals who are

forced into involuntary, premature retirement, provided they are both *insured* and *disabled*,

regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve

months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego*

*v. Weinberger*, 516 F. 2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290,

1295 (7th Cir. 1997).  For purposes of Title II and Title XVI disability benefits, Mears met the

special earnings requirements on May 23, 2003, her amended onset date, and continued to meet the

requirements through the date of the ALJ's decision — *i.e.*, September 1, 2006.  (R. 14, 18).

While these are separate and distinct programs, applicants seeking benefits under either

statutory provision must prove "disability" within the meaning of the Act, which defines disability

in virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3),

1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  Under both provisions, disability is defined

as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A).  Moreover, the law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI.  *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).

**B.**   ***Standard of Review***

**1.**   ***Summary Judgment***

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case.  *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000).  If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and

supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.     *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.*

### C.   *ALJ's Determination*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05. The claimant has the burden to prove disability under the first four steps. *See Myers*, 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *See Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236. If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of her existing impairments, the burden shifts back to the claimant to prove that she cannot, in fact, perform the alternate work suggested. *See Boyd*, 239 F.3d

at 705.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *See id*.

The mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act.  *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed disabled under the Act only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit.  *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a)-(b), 416.972.

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).  "[A]n individual is 'under a disability, only if [her] impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'"  *Greenspan*, 38 F.3d at 236 (quoting 42

7

U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.    Claimant met the insured status requirements of the Social Security Act through March 31, 2005.

2.    Claimant has not engaged in substantial gainful activity since May 23, 2003 (amended onset date), (20 C.F.R. §§ 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

3.    Claimant has the following severe impairments: degenerative disc and degenerative facet joint disease of the lumbar spine, left hip osteoarthritis and diabetes mellitus (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

4.    Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm and leg controls.  To be considered capable of performing a full or wide range of light work, an individual must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods.  The undersigned finds that the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently.  She can sit, stand and walk for 6 hours in an 8 hour day.  She can occasionally climb ramps, stairs, ladders, ropes and scaffolds.  She can occasionally stoop and crouch.  She can frequently balance, kneel, and crawl.

6.     Claimant has not been under a "disability," as defined in the Social Security Act, from May 23, 2003 (amended onset date) through the date of this decision (20 C.F.R. §§ 404.1565 and 416.965).

(R. 12-14, 16).  Because the ALJ determined that Mears could perform her past relevant work as a liaison officer, he did not reach step five in the sequential evaluation process.  (R. 16).

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied.  *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3).  To determine whether the decision to deny Mears' claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and work history.  *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Any conflicts in the evidence are to be resolved by the ALJ and not the court.  *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

**D.     *Issues Presented***

Mears contends that the findings of the ALJ are not supported by the evidence presented.  Specifically, Mears argues that the ALJ erred by evaluating each physical or mental impairment separately without assessing the complaints together.  *See* Docket Entry No. 14, at p. 5.  Additionally, Mears, alleges that the ALJ failed to consider how her combined medical issues

would interfere with her work capabilities. *See id.*, at p. 6. Mears further contends that the ALJ erred by not requiring the VE to state the availability of liaison officer positions in the geographical area in which Mears resides. *See id.* The Commissioner disagrees with Mears' contentions and maintains that the ALJ's decision is supported by substantial evidence. *See* Docket Entry No. 16.

**E.**     ***Review of ALJ's Decision***

**1.**     ***Objective Medical Evidence and Opinions of Physicians***

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990). If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry. *See id.* at 532; *see also* 20 C.F.R. § 416.920(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. §§ 404.1523, 416.923; *see also Loza*, 219 F.3d at 393.  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that her impairment or combination of impairments matches or is equivalent to a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d at 619.  The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See* id.  An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria.  *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R. §§ 404.1526(a), 416.926(a).  The applicable regulations further provide:

> (1)(i)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
>    (A)    You do not exhibit one or more of the medical findings specified in the particular listing, or
>
>    (B)    You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

(ii)   We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. §§ 404.1526(a), 416.926(a).  Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment."  *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner.  *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. §§ 404.1527(e), 416.927(e).

A review of the medical records and testimony submitted in connection with Mears' administrative hearing reveals that Mears had a history of back pain, hip pain, and diabetes.  On October 29, 2002, Mears met with a physical therapist, Tom Dunn, P.T. ("Dunn"), for a physical. (R. 121).  Mears complained of low back and sacroiliac pain which allegedly started after lifting objects at work two weeks prior.  (R. 121).  She reported that the pain was mostly on her left side and was a consistent, sharp aching feeling.  (R. 121).  Mears alleged that walking and applying pressure to the area induced pain, while heat on the same area relieved the pain.  (R. 121). According to Mears, another physician had prescribed her Ibuprofen and Cyclobenzapine for pain, and Glucophage and Glipizide for her diabetes which, reportedly, was under control.  (R. 121). The physical revealed no neurological deficits.  (R. 121).  Mears, however, had a decreased range of motion in rotation and lateral flexion[2] on her back.  (R. 121).  Point tenderness over the left PSIS[3] and surrounding region was found, and further orthopedic testing was performed with

---

[2]  " Flexion" is the act of bending or condition of being bent.  *See* DORLAND' S ILLUSTRATED MEDICAL DICTIONARY 685 (29th ed. 2000).

[3]  " PSIS" is the posterior superior iliac spine.  The posterior extremity of the iliac crest, the uppermost point of attachment of the sacrotuberous and posterior sacroiliac ligaments.  *See* STEDMAN' S MEDICAL

difficulty due to back pain complaints.  (R. 121).  Dunn recommended that Mears perform light duties while on the job for the next two weeks, continue to take her medications as needed, stretch her lower back region as demonstrated by him, and return for a check-up in two weeks.  (R. 121).

On January 9, 2003, Shelley D. Manning, M.D. (" Dr. Manning") ordered two unilateral x-rays to be taken of Mears' left hip.  (R. 348).  The exam revealed minimal sclerosis[4] in the upper acetabulum.  (R. 348).  However, the femoral[5] head was within normal limits and joint space was well preserved.  (R. 348).

On March, 13, 2003, a review of an x-ray of Mears' lumbar spine by Leonard Gross, M.D. ("Dr. Gross") revealed that Mears' vertebral bodies were intact and well aligned, and that there were no fractures or destructive lesions.  (R. 122).  Dr. Gross' impression was that there was "very minimal degenerative arthritis of the articular facet[6] joints, and slight anterior marginal spondylosis[7] at L2-3.  (R. 122).

On March 25, 2003, Mears was admitted to Harris County Hospital District ("HCHD") emergency room after complaining of low back pain and left thigh and groin gramps that had started

---

DICTIONARY 1673 (27th ed. 2000).

[4]  " Sclerosis" is the abbreviation for an induration or hardening, such as hardening of a part from inflammation, increased formation of connective tissue, or disease of the interstitial substance.  *See* DORLAND'S, *supra*, at 1611.

[5]  " Femoral" pertains to the femur or to the thigh.  *See* DORLAND'S, *supra*, at 659.

[6]  " Facet" pertains to a relatively small articular surface of a bone, especially a vertebra.  *See* STEDMAN'S, *supra*, at 638.

[7]  " Spondylosis" pertains to the ankylosis of the vertebra; often applied nonspecifically to any lesion of the spring of a degenerative nature.  Ankylosis pertains to the stiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint.  *See* STEDMAN'S, *supra*, 90, 1678.

three days prior.  (R. 136).  She was discharged after being diagnosed with inguinal[8] musculoskeletal

trauma.  (R. 137).  Mears was prescribed Motrin[9] and Flexuril.  (R. 137).  The nurse instructed Mears

to return to the emergency center if the condition persisted but otherwise use the Martin Luther King

("MLK") community clinic for future follow-up appointments.  (R. 137).

On March 28, 2003, Mears visited the MLK Clinic, complaining of pain in her left hip.

(R. 142).  John Clement, M.D. ("Dr. Clement") reviewed an x-ray of Mears' left hip, noting that

there was minimal superior joint space narrowing, sclerosis, and minimal hypertrophic osteophyte

formation.  (R. 142).  An approximately 8 mm bone island[10] was present within the left acetabulum.[11]

(R. 142).  Additionally, a second bone island was noted in the intertrochanteric[12] region.  (R. 142).

There was no evidence, however, of fracture or dislocation.  (R. 142).  Dr. Clement's impression was

that there was minimal degenerative osteoarthritis within Mears' left hip.  (R. 142).

---

[8]  " Inguinal" pertains to the inguen, or groin.  *See* DORLAND'S, *supra*, at 899.

[9]  " Motrin" is commonly used to relieve minor aches and pains associated with muscular aches, minor pain of arthritis, backaches, and temporarily reduces fever. However, it may cause a severe allergic reaction, especially in people allergic to aspirin. Symptoms may include hives, facial swelling, asthma (wheezing), shock, skin reddening, rash, blisters, and stomach bleeding. *See* PHYSICIAN'S DESK REFERENCE 1866 (61st ed. 2007).

[10]  " Bone island" is the benign focus of mature cortical bone appearing within trabecular bone on a radiograph.  *See* DORLAND'S, *supra*, at 921.

[11]  " Acetabulum" is the large cup-shaped cavity on the lateral surface of the os coxae in which the head of the femur articulates.  *See* DORLAND'S, *supra*, at 12.

[12]  " Intertrochanteric" pertains to the space between the greater and the lesser trochanter. Trochanter is defined as either of the two processes below the neck of the femur.  *See* DORLAND'S *supra*, at 910, 1881.

On May 25, 2003, Mears complained of pain in her left inguinal when she was admitted to the HCHD emergency room.  (R. 138).  The physician determined that Mears had a TTP[13] in the left inguinal area, tenderness in the left hip, and she tested negative for the straight left raise test.[14] (R.138).  Mears was diagnosed with musculoskeletal trauma and was prescribed Flexuril and Motrin. (R. 138).  It was noted on Mears' chart that a previous MRI had found osteoarthritis on her hip. (R. 138).  It was also noted that Mears was taking Glucose, Allegra, and Methamen.  (R. 138).

On June 10, 2003, HCHD's Rehabilitation Services performed an outpatient physical therapy lower extremity screen on Mears were she complained about problems with proper back posture, her LE[15] flexibility, and her ability to walk.  (R. 174-175).  The physical therapist ("P.T.") noted that Mears' past medical record indicated that she has been diagnosed with diabetes and had been diagnosed with a left groin pull.  (R. 174-175).  Mears also alleged that she injured her left lower back in November 2002.  (R. 175).  The  P.T. recommended an individualized home exercise program to Mears that would help her manage pain through proper posture and body mechanics. (R. 175).  The P.T. believed that, in the future, Mears should be able accomplish simulated work acts such as bending, squatting, and lifting objects, with proper mechanics.  (R. 175).  The P.T. recommended that Mears rest for 35 minutes if the pain increased and return once a week for four weeks for more physical therapy.  (R. 175).

---

[13]  " TTP" is the abbreviation for thrombotic thrombocytopenic purpura which is known as clotting within a blood vessel which may cause infarction of tissues.  *See* STEDMAN' S, *supra*, at 1831, 2017.

[14]  The " straight leg raise" examination, also known as the Lachman' s test,  is a maneuver to detect deficiency of the anterior cruciate ligament; with the knee flexed 20-30 degrees, the tibia is displaced anteriorly relative to the femur; a soft endpoint of greater than 4 mm of displacement is positive (abnormal).  *See* STEDMAN' S, *supra*, at 1804.

[15]  " LE" is the abbreviation for lower exterior.  *See* STEDMAN' S, *supra*, at 635.

On July 8, 2003, Mears' P.T. performed a reassessment on Mears regarding her progress and included the comment that Mears had attended only four out of her last seven scheduled appointments. (R. 315). Mears' therapy sessions consisted of manual therapy, but her progress was noted as being slow and steady with respect to increasing Mears lower back strength. (R. 315). The P.T. noted that, although Mears appeared to be compliant with her progress, she continued to complain of pain from her left hip. (R. 315). Mears continued to demonstrate difficulty in her left hip with regards to her ability to bend, squat, and reach in spite of the P.T.'s endurance training program. (R. 315). The P.T. recommended that Mears continue to see the instructor for flexibility and strength training through manual therapy. (R. 315). The P.T. opined that it would be inappropriate for Mears to return to work. (R. 315).

On August 18, 2003, Mears' P.T. performed a reassessment on Mears and noted that Mears had attended four out of the last five schedule appointments. (R. 313). The P.T. reported that Mears' had continued to make slow, steady progress and that the therapy has helped with 60% of her problems. (R. 313). Mears reported that she was not taking as many pain medications as before and was able to drive for 20 minutes and walk for 5-7 minutes. (R. 313). Mears, however, had continued to complain about discomfort regarding daily living activities, including vacuuming and bending forward. (R. 313). The P.T. recommended that Mears continue to see a health instructor for lower extremity flexibility and strength training through manual therapy. (R. 313).

On October 30, 2003, Mears' P.T. wrote on her physical therapy chart that Mears had attended only 14 out of her last 21 appointments. (R. 308). Although Mears had received stretching exercises that were aimed at decreasing her symptoms and increasing her strength,

16

Mears' progress was considered poor and she exhibited a decreased ability to perform her daily exercises.  (R. 308).   Mears indicated that she had been prescribed pain medication by her physician.  (R. 308).  Mears was told to return to her doctor if her symptoms changed.  (R. 308).

On December 16, 2003, Mears visited HCHD as an outpatient to obtain a flu shot.  (R. 155).  It was noted on Mears' chart, however, that she was complaining about pain in her left hip.  (R. 155).  The attending physician noted that there was tenderness and pain coming from the posterior superior iliac spine.  (R. 155).  It was reported that steroids relieved the pain and that she did not test positive for the straight leg raise test (" SLR").  (R. 155). The physician opined that the problem was being caused by hip osteoarthritis, but instructed Mears to consult an orthopedic surgeon for confirmation.  (R. 155).   The physician also recommended that Mears begin to use a cane.  (R. 155).   On February, 26, 2004, Mears was treated as an outpatient at HCHD at which time she reported experiencing constant lower back pain on her left side all the time and that the problems had worsened over time.  (R. 303).   She indicated that the pain increased when bending her back and getting up.  (R. 303).

On March 15, 2004, the Orthopedic Consulting Services division at HCHD conducted an evaluation of Mears.  (R. 139).  Mears reported that she first began to experience pain along the posterior of the troch bursa but the pain had been relieved for 10 days when prescribed steroids.

(R. 139). The examiner found that the left external hip rotation was limited.  (R. 139).

On April 7, 2004, Robert Sims III, M.D. (" Dr. Sims") reviewed an x-ray of Mears' left hip and pelvis which was taken at the HCHD on March 30, 2004.  (R. 140).   There were no fractures or dislocations.  (R. 140).  The bones were well mineralized and there are multiple

calcifications[16] over the pelvis, likely secondary to fibroids.[17]  (R. 140).  The sacroiliac[18] joints

showed no abnormalities.  (R. 140).  Dr. Sims' impression was reported as mild degenerative

joint disease of the left hip.  (R. 140).

On May 6, 2004, Mears was treated as a patient at HCHD's Orthopedic Clinic,

complaining of muscle spasms in the lower back and left thigh.  (R. 216).  The physician noted

that Mears used a cane and was taking Vicodin[19] and Flexuril.  (R. 216).  The physician ordered

that x-rays and an MRI be taken of her left spine.  (R. 216).

On May 10, 2004, Mears was treated as an outpatient at HCHD complaining of chronic

pain in her lower back and left hip.  (R. 241).  Mears reported her past medical history as

including diabetes.  (R. 241).  The nurse noted that Mears last visited the Clinic on December 16,

2003, that she had undergone physical therapy in the past, and that she had a future appointment

with a physical therapist on June 2004.  (R. 241).  Mears alleged that she has consulted an

orthopedic surgeon previously regarding her hip pain and that an MRI had been ordered.  (R.

241).  The chart indicated that Mears' symptoms included shortness of breath and back pain.  (R.

---

[16]  " Calcification" is the process by which organic tissue becomes hardened by a deposit of calcium salts within its substance. See DORLAND' S, *supra*, at 263.

[17]  " Fibroids" pertains to having a fibrous structure. Fibrous is defined as having a tumor composed mainly of fibrous or fully developed connective tissue. See DORLAND' S, *supra*, at 672.

[18]  " Sacroiliac" pertains to the sacrum and ilium. A sacrum is the triangular bone below the lumbar vertebrae. The ilium is the expansive portion of the hip bone.  See DORLAND' S, *supra*, at 876, 1593.

[19]  " Vicodin" is commonly used for the relief of moderate to severe pain. Adverse reactions include lightheadedness, dizziness, sedation, nausea, and vomiting.  Other adverse reactions include drowsiness, mental clouding, lethargy, impairment of mental and physical performance, anxiety, fear, dysphoria, psychic dependence, mood changes, constipation, ureteral spasm, respiratory depression, hearing impairment and loss, and skin rash. See PHYSICIAN' S DESK REFERENCE, *supra*, at 538.

241).  The back pain was noted as worsening with walking and sitting for prolonged periods.  (R.

241).  Mears' medications at that time included Ibuprofen, Vicodin, and Flexuril.  (R. 241).  The

nurse instructed Mears to follow-up with the orthopedic surgeon after the MRI was taken of the

lumbar spine and attend physical therapy as ordered by that physician.  (R. 241).  The nurse also

instructed Mears to take two tablets of extra strength Tylenol every six hours as needed for pain

and to continue taking Ibuprofen as previously prescribed.  (R. 241).

On July 8, 2004, Lora Walker, P.T. ("Walker") evaluated Mears at HCHD's

Rehabilitation Services, where she was diagnosed with a low back strain.  (R. 287).  Mears

reported experiencing muscle tightness, weak abs, poor posture and body mechanics.  (R. 287).

Mears reported that she injured her back at work and her left groin in a separate incident on

October 2002.  (R. 287).  She alleged that sitting and lying down for long periods of time,

walking, and moving from a sitting-to-standing position, worsened her symptoms.  (R. 287).

Mears claimed that lying on her back and her right side improved her symptoms.  (R. 287).

Walker showed Mears how to improve her posture and body mechanics, and gave her an

individualized home program that also included an aerobic conditioning system, which was

intended to improve her problems within 4-6 weeks.  (R. 288).

On July 21, 2004, Mears underwent a physical residual functional capacity assessment

where she was diagnosed with musculoskeletal strain and mild degenerative osteoarthritis of the

left hip.  (R. 206).  The examiner, Eun Kwun, M.D. ("Dr. Kwun") opined that Mears'

allegations regarding the extent of her disabilities were not fully supported by the evidence.  (R.

213).  According to Dr. Kwun, Mears could lift 10 pounds occasionally, lift less than 10 pounds

frequently, and sit, stand or walk for 6 hours in an 8 hour workday.  (R. 207, 213).  Dr. Kwun

also determined that Mears could climb stairs or ramps, stoop, and crouch occasionally, and balance, kneel, and crawl frequently.  (R. 208).

On August 7, 2004, Susan Weathers, M.D. (" Dr. Weathers") reviewed the results of Mears' spine lumbosacral AP[20] and LAT x-ray.  (R. 222).  The x-ray revealed that there were five non-rib bearing lumbar type vertebral bodies.  (R. 222).  Small endplate osteophytes[21] were noted at various levels including L1-L2, L2-L3, and L3-L4.  (R. 222).  The intervertebral disc spaces were well maintained and there was no evidence of anterolisthesis or retrolisthesis.  (R. 222).  There was scatter coarse calcifications projecting in the region of the pelvis likely representing calcified fibroids.  (R. 222).  Dr. Weathers also reviewed the results of Mears' MRI of her lumbar spine.  (R. 224).  Dr. Weathers noted minimal disc bulges at the L2-L3, L3-L4, and L4-L5 levels with no spinal canal stenosis[22] or stenosis of the neural foramina.  (R. 224).  Dr. Weathers' impression was that there was minimal circumferential annular bulge in the above described levels without spinal canal stenosis or neural foramina stenosis, and that Mears had uterine fibroids.  (R. 224).

On August 20, 2004, Mears was treated as an outpatient at HCHD' s Adult Primary Care Ambulatory for problems relating to her foot.  (R. 292).  After the physician confirmed that Mears

---

[20] " AP" is the abbreviation for anteroposterior.  *See* DORLAND' S, *supra*, at 2005.

[21] " Osteophytes" is a bony excrescence or osseous outgrowth.  *See* DORLAND' S, *supra*, at 1290.

[22] " Spinal canal stenosis" is the narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space; symptoms are caused by compression of the cauda equina and include pain, parenthesis, and neurogenic claudication.  The condition may be either congenital or due to spinal degeneration.  *See* DORLAND' S, *supra*, at 1698.

had diabetes mellitus, the physician educated Mears about her condition, and prescribed Nutra Plus, a foot cream suitable to diabetic use.  (R. 292).

On September 1, 2004, Walker reported that Mears had missed her physical therapy appointment with her and that she was not in compliance with the attendance policy.  (R. 286).

On October 26, 2004, Mears underwent another physical residual functional capacity assessment where Frederick Cremona, M.D. (" Dr. Cremona") diagnosed Mears with low pack pain, diabetes, and a possible minimal disk bulge.  (R. 248).  Dr. Cremona concluded that Mears' allegations of disability were not fully supported by the evidence.  (R. 253).  Dr. Cremona found that Mears could lift 20 pounds occasionally, lift less than 10 pounds frequently, and sit, stand or walk for 6 hours in an 8 hour workday.   (R. 207, 253).  Dr. Cremona also determined that Mears could climb stairs or ramps, stoop, and crouch occasionally, and balance, kneel, and crawl frequently. (R. 208).

On December 29, 2004, Mears was interviewed at HCHD' s Clinic regarding her out-patient record.  (R. 284).  Mears'  past history indicated that she was diagnosed with diabetes mellitus since 1998 and that she had previously inquired into the possibility of getting diabetic shoes because of foot problems.  (R. 284).  She also complained about lower back problems.  (R. 284).  The physician confirmed that Mears has diabetes mellitus, but Mears was told that she did not need diabetic shoes at that point in time.  (R. 284).  Likewise, because Mears complained about pain and weakness in her back, the physician instructed Mears to see a P.T. for back strengthening training.  (R. 284).

On January 4, 2005, Mears was seen by an occupational therapist (" O.T.") regarding weakness and pain in her hands.  (R. 276).  The O.T. found that Mears had numbness in her

fingertips and difficulty putting on socks and shoes.  (R. 276).  The O.T. noted that Mears had difficultly with some activities of daily living and decreased fine motor coordination in her hands.  (R. 277).  Mears, however, scored the highest number possible on her activity of daily living functional levels for all other categories.  (R. 276).  Mears' goal, as set by the O.T., included increasing Mears' hand grip strength and decreasing pain in her hands and left shoulder.  (R. 277).

On February 1, 2005, Mears was an outpatient at HCHD's Rehabilitation Services where she was diagnosed with lower back pain.  (R. 281).  Walker noted that Mears had previously been seen before by P.T.'s regarding the same problems, but had not kept her physical therapy appointments since July 2004.  (R. 281).  Mears indicated that she was taking walks for 10-15 minutes at a time, 4 times a week, and that pain medications and warm weather improved her symptoms.  (R. 281).  She also indicated, however, that sitting or standing for long periods of time worsened her condition.  (R. 281).  The physical therapist found that there was a slight increase in Mears' lumbar lordosis[23] and that she had a weak transversus abdominis.[24]  (R. 281).

On March 18, 2005, Mears was treated as an outpatient at HCHD Adult Primary Care Ambulatory.  (R. 283).  She was diagnosed with chronic low back pain and was prescribed Vicodin and Ibuprofen.  (R. 283).

On April 15, 2005, Walker again noted that Mears had missed her physical therapy appointment and was not in compliance with the attendance policy.  (R. 274).

---

[23]  "Lordosis" is both the anterior concavity in the curvature of the lumbar and cervical spine as viewed from the side and an abnormal increase in this curvature.  *See* DORLAND'S, *supra*, at 1027.

[24]  "Abdominis" is a trasverse abdominal muscle.  *See* DORLAND'S, *supra*, at 1160.

On October 3, 2005, Mears was seen by a O.T. at HCHD Rehabilitation Services.   (R. 263).   Mears had been referred to the O.T. because of increased pain and weakness related to chronic back pain and fibromyalgia.[25]   (R. 263).   It was noted that Mears was taking medication for her diabetes as well as Ibuprofen and Vicodin.   (R. 263).   The activity of daily living tests found that Mears had decreased fine motor coordination in both hands.   (R. 263).   Likewise, Mears scored the second highest level on all the activity of daily living functional scales, which included feeding, grooming, bathing/showering, upper extremity dressing, lower extremity dressing, and functional mobility.   (R. 263).   The O.T. concluded that Mears had decreased grip and pinch strength, and increased pain and sensation in her hands.   (R. 264).   It was also noted in the chart that Mears was using glasses.   (R. 264).   Mears' goals for discharge, as set by the O.T., included increasing her grip and pinch strength, and decreasing her pain through pain management exercises.   (R. 264).

On October 7, 2005, Mears visited HCHD for a flu shot, but it was noted that Mears was complaining about pain radiating from her neck to her left shoulder and down to her left hand. (R. 269).   Mears also stated that she had been experiencing hand pain since April 2005.   (R. 269). It was reported that lifting objects worsened the symptoms, but that Ibuprofen and Vicodin relieved the symptoms.   (R. 269).   Mears indicated that x-rays had been taken of her hands on July 7, 2005, an MRI on her spine sometime in the past, and another x-ray of her endplate.[26]   (R. 269).

---

[25]   " Fibromyalgia" is a syndrome of chronic pain of musculoskeletal origin but uncertain cause.   *See* STEDMAN'S, *supra,* at 671.

[26]   " End plate" is the ending of a motor nerve fiber in relation to a skeletal muscle fiber.   *See* STEDMAN'S, *supra,* at 594.

Although it was noted that Mears attended occupational therapy sessions from October 3, 2005, through November 17, 2005, Mears missed her last scheduled appointment.  (R. 259).  Thus, Mears was discharged from occupational therapy services due to failure to adhere to attendance policy and failure to reschedule missed sessions within a timely manner.  (R. 259).

On February 22, 2006, Mears had an electromyography (" EMG") taken of her wrists and hands.  (R. 332).  Based on the electrodiagnostic evidence, Faye Tan, M.D. (" Dr. Tan") concluded that there was a bilateral median mononeuropathy[27] at the wrists.  (R. 332).  There was also sensory and predominantly demyelinating[28] on the right wrist that was consistent with mild carpal tunnel syndrome and sensorimotor and predominantly demyelinating on the left, consistent with moderate carpal tunnel syndrome.  (R. 332).

On June 29, 2006, Mears testified at her administrative hearing that she had diabetes, back pain, and right knee problems.  (R. 384).  She complained that the medications, including Vicodin and Flexuril, had undesirable side effects such as making her drowsy.  (R. 385-286).  She also stated that she has been unable to drive for the past year.  (R. 386).  Further, she claimed that she could no longer play the piano because of carpal tunnel syndrome and that she could not read the sheet music, but it was unclear as to whether it was due to medication or poor eyesight.  (R. 387).  Moreover, she asserted that she could no longer pray because it hurt to get up from a kneeling position and that it hurt to bend and reach with her arms.  (R. 384).

---

[27]  " Mononeuropathy" is a disorder involving a single nerve.  *See* STEDMAN' S, *supra*, at 1129.

[28]  " Demyelinating" is the loss of myelin with preservation of the axons or fiber tracts.  Central demyelination occurs within the central nervous system (*e.g.*, the demyelination seen with multiple sclerosis); peripheral demyelination affects the peripheral nervous system.  *See* STEDMAN' S, *supra*, at 472.

Mears testified that within the past month that she had tried to lift her grandson, who weighed 15 pounds at the time, but dropped him by accident.  (R. 391).  She also asserted that she used a cane for support and had difficulty balancing because standing up straight caused her pain in her left hip.  (R. 392-393).  Mears further testified that she does not clean or vacuum the house, that she was incapable of getting out of the bathtub without the assistance of a newly installed handicap rail, and that she needed other family members help to get dressed.  (R. 394).  She claimed that she used to have an active life but no longer goes out except to attend church services. (R. 396).  She maintained, however, that she went to the grocery store with usually someone else, two times a month, by taking the bus.  (R. 399-400).  Mears claimed she used an electric or battery-powered cart was at the store.  (R. 400).  Mears claimed she received rides from other people for her medical appointments.  (R. 399).

After the administrative hearing, but before the ALJ rendered his decision, Mears submitted a one-page letter dated July 6, 2006, to the SSA from Lisa McCarren, MS, LPC (" McCarren") with HCHD, opining that " after an extensive psychosocial assessment and individual therapy" that Mears meets the diagnostic criteria for major depressive disorder.  (R. 352).  According to McCarren, Mears'  had a Global Assessment of Functioning (" GAF") rating of 55.[29]  (R. 352).

---

[29]  A GAF score represents a clinician's judgment of an individual's overall level of functioning.  *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") 32 (4th ed. 2000).  The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning—*e.g.*, 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for himself).  The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. Lower GAF scores signify more serious symptoms.  A GAF rating of 51-60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).  *See id.* at 34.

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist. *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000). Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings. *See Scott*, 770 F.2d at 485.

Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown. *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237. Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211. It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the case at bar, based on the objective medical facts and opinions of physicians, there is substantial evidence in the record to support the ALJ's determination that Mears suffered from impairments which did not meet or equal the requirements of a listing. Mears alleges that the ALJ

erred by failing to properly evaluate the combined effect of her impairments.  *See* Docket Entry No.

14, at pp. 4-5.  Mears, however, failed to provide specific examples that would demonstrate these

allegations.  *See id.*  Contrary to Mears' allegations, however, the ALJ found that Mears did not

have a " combination of impairments" to meet or medically equal one of the listed impairments

in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526,

416.920(d), 416.925 and 416.926).   The ALJ expressly determined:

> On the basis of the objective evidence, the undersigned Administrative Law Judge
> finds that none of the claimant' s impairments, either singly or in combination, are
> attended by clinical signs or laboratory findings which meet or medically equal one
> of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

(R. 14).  " An ALJ' s findings that multiple impairments do not render a claimant disabled will

be upheld unless he 'so fragmented'  plaintiffs ailments that he failed to evaluate their combined

effect."  *Smith v. Apfel*, 87 F. Supp. 2d 621, 628 (W.D. La. 2000) (citing *Fraga v. Bowen*, 810

F.2d 1296, 1305 (5th Cir. 1987)); *accord Winget v. Astrue*, No. MO-07-CV-017, 2007 WL

4975206, at *9 (W.D. Tex. Dec. 14, 2007).

Here, the ALJ thoroughly discussed Mears'  limitations in combination before determining

that she did not meet a listing.  (R. 11-16).  Indeed, citing the results of Mears'  x-rays, MRIs,

physical therapy sessions, and hospital visits as evidence, the ALJ acknowledged Mears'  pain in

her left hip as a severe impairment.  (R. 138, 140, 142, 155, 175, 206-208, 213, 216, 249-250,

253, 281,  313, 315, 348).  Likewise, the ALJ cited the results of Mears'  physical exams, MRIs,

AP, LAT, physical therapy sessions, and hospital visits as evidence that her degenerative disk and

degenerative facet joint disease of the lumbar spine was a severe impairment.  (R. 121-122, 142,

216, 222, 224, 281, 287, 315).   Similarly, the ALJ cited the results of Mears'   statements

regarding the status of her diabetes, her occupational therapy sessions, and her visits to various physicians as evidence that her diabetes mellitus was a severe impairment.  (R. 121, 174, 263-264, 276-277, 284, 292).

The ALJ properly analyzed these conditions, alone and in combination, and determined that they were not of *disabling* severity.  (R. 11-13).  The ALJ noted Mears' allegations of pain, but properly observed that the medical records revealed minimal and/or negative findings.  (R. 13, 121, 122, 222, 224, 226).  Also, there was no evidence of intense or continuous pain.  In this regard, Mears neither took an inordinate amount of pain medication nor had she sought emergency room care on a frequent basis.  Physical therapy had been generally successful in controlling her pain symptoms.  (R. 12-15).  Medical impairments that reasonably can be remedied or controlled by medication or treatment are not disabling."  *Glenn v. Barnhart*, 124 Fed. Appx. 828, 829 (5th Cir. 2005) (citing *Johnson v. Bowen*, 864 F.2d 340, 347 (5th Cir. 1988); *Fraga*, 810 F.2d at 1303-04; *Adams v. Bowen*, 833 F.2d 509, 511-12 (5th Cir. 1987)).

Additionally, as the ALJ noted,  Mears had reported that her diabetes was under control, and that an August 2003, EMG revealed insufficient evidence of peripheral neuropathy or diabetes amyotrophy.  (R. 13).  To the extent Mears complains of blurred vision, this contention is not supported by the record evidence.  (R. 14).  With regard to Mears' alleged depression, the ALJ had good cause to place little or no weight in McCarren's letter.  (R. 13).  As a threshold matter, McCarren, who holds a Masters of Science degree and is a Licensed Professional Counselor, cannot render a medical diagnosis, and is not considered an acceptable medical source under the social security regulations.  *See* 20 C.F.R. § 404.1513; *Hoelck v. Barnhart*, No. A-06-CA-526 SS, 2007 WL 496850, at *2 (W.D. Tex. 2007), *aff'd*, 261 Fed. Appx. 683 (5th Cir. 2008) (a

Licensed Professional Counselor not an acceptable medical source and GAF assessment from a LPC did not qualify as evidence).  Moreover, there are no underlying treatment notes in the administrative record to support the existence of a mental condition.   As such, the ALJ correctly concluded that Mears' alleged mood disorder was not medically determinable.

There is no evidence that the ALJ "fragmentized" Mears' ailments; instead, the ALJ fully complied with the requirement that he consider the combined effects of the impairments in determining whether Mears was disabled.  Consequently, substantial evidence supports the ALJ's decision that Mears suffered from impairments which did not meet or equal the requirements of a listing.

### 2.    *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints.  *See Falco*, 27 F.3d at 163 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).  When a plaintiff alleges disability resulting from pain, she must establish a medically determinable impairment that is capable of producing disabling pain.  *See Ripley*, 67 F.3d at 556 (citing 20 C.F.R. § 404.1529).  Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity.  *See id.*

It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128. The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations

29

because of the opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at 164 n.18.

Moreover, " [t]he Act, regulations and case law mandate that the Secretary require that subjective

complaints be corroborated, at least in part, by objective medical findings."  *Harrell v. Bowen*,

862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529;

*Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522

(citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d

1308, 1309 (5th Cir. 1986).

   As a matter of law, the mere fact that working may cause a claimant pain or discomfort

does not mandate a finding of disability.  *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d

1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986).

Additionally, the mere existence of pain does not automatically bring a finding of disability.

*Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.  It must be

determined whether substantial evidence indicates an applicant can work despite being in pain or

discomfort.  *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir.

1985).

   For pain to rise to the level of disabling, that pain must be " constant, unremitting, and

wholly unresponsive to therapeutic treatment."  *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at

163; *Wren*, 925 F.2d at 128.  The decision arising from the ALJ' s discretion to determine

whether pain is disabling is entitled to considerable deference.  *See Chambliss*, 269 F.3d at 522;

*Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706.  However, an ALJ may discount subjective

complaints of pain as inconsistent with other evidence in the record.  *See Dunbar v. Barnhart*, 330

F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Mears testified regarding her complaints of pain. (R. 384-

400).  The ALJ, however, found that Mears' subjective complaints regarding her pain were not

entirely credible.  (R. 15).  The ALJ's decision indicates that he thoroughly considered both

objective and subjective impairments related to the severity of Mears' pain:

> The Administrative Law Judge has taken into consideration the claimant's testimony and allegations of symptoms and limitations.  The issue raised by the claimant's allegation is not the existence of pain but rather the degree of pain or other subjective symptom's which the claimant experiences.  The objective clinical findings (although not the only factor to be considered) do not support the degree of pain and functional limitation's which the claimant alleges.

> * * *

> While [the] claimant testified that she suffered from significant pain, she did not testify to taking an inordinate amount of pain medication.  She has not sought emergency room care on a frequent basis and has not been hospitalized for any duration for any condition since she alleged she became disabled.

> * * *

> There is no evidence to indicate serious muscle weakness, muscle spasm, atrophy, weight loss, or other signs of progressive physical deterioration which might be expected when an individual experiences intense or continuous pain.

> * * *

> The undersigned concedes that the claimant's problems may be expected to produce mild chronic pain or discomfort.  However, the medical records do not show repeated hospitalizations or aggressive forms of therapy (such as surgery or

treatment at a pain clinic) that would be expected if she experienced severe, persistent and unremitting pain.

(R. 14-15). Moreover, as the ALJ properly noted, Mears had received conservative treatment for controlling her symptoms. (R. 15). *See Johnson*, 864 F.2d at 348 (conditions controlled by medication or therapy cannot serve as a basis for a finding of disability). The ALJ also noted that Mears would have received greater symptom control had she been compliant with her treatment. (R. 15, 259, 274, 286, 308, 313, 315). Mears' noncompliance with therapy indicates that the symptoms may not have been as limiting as Mears alleged. *See Johnson v. Sullivan*, 894 F.2d 683, 685 n.4 (5th Cir. 1990) (failure to follow treatment is grounds for a finding of not disabled).

Finally, the Court does not doubt that Mears suffers from pain. However, the records do not support a finding that Mears' pain is constant and unrelenting and wholly unresponsive to therapeutic treatment. *See Chambliss*, 269 F3d at 522; *see also Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128. Accordingly, there is substantial evidence to support the ALJ's finding that Mears' subjective reports of pain do not rise to the level of disability.

### 3. *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> . . . only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work . . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).   The Commissioner bears the burden of proving that

a claimant's functional capacity, age, education, and work experience allow her to perform work

in the national economy.   *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also*

*Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38

F.3d at 236.   If the Commissioner fulfills this burden by pointing out potential alternative

employment, the claimant, in order to prevail, must prove that she cannot perform the alternate

work suggested.   *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594;

*Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

   To determine whether a claimant can return to a former job, the claimant's " residual

functional capacity" must be assessed.   *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir.

1990); *see also* 20 C.F.R. § 404.1545.   This term of art merely represents an individual's ability

to perform activities despite the limitations imposed by an impairment.   *See Villa v. Sullivan*, 895

F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545.   Residual functional capacity

combines a medical assessment with the descriptions by physicians, the claimant or others of any

limitations on the claimant's ability to work.   *See Elzy v. Railroad Retirement Bd.*, 782 F.2d

1223, 1225 (5th Cir. 1986); *see also* 20 C.F.R. § 404.1545.   When a claimant's residual

functional capacity is not sufficient to permit her to continue her former work, then her age,

education, and work experience must be considered in evaluating whether she is capable of

performing any other work.   *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520.   The testimony

of a vocational expert is valuable in this regard, as " [she] is familiar with the specific

requirements of a particular occupation, including working conditions and the attributes and skills

needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145;

*see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA

rulings ("SSR"). *See Myers*, 238 F.3d at 620. The Social Security Administration's rulings are

not binding on this court, but they may be consulted when the statute at issue provides little

guidance. *See id.* In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional

capacity and exertional capacity. *See id.* In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an
> assessment of an individual's ability to do sustained work-related physical and
> mental activities in a work setting on a regular and continuing basis. A regular and
> continuing basis means 8 hours a day, for 5 days a week, or an equivalent work
> schedule. The RFC assessment is a function-by-function assessment based upon
> all of the relevant evidence of an individual's ability to do work-related activities.
> However, without the initial function-by-function assessment of the individual's
> physical and mental capacities, it may not be possible to determine whether the
> individual is able to do past relevant work. . . . RFC involves both exertional and
> non-exertional factors. Exertional capacity involves seven strength demands:
> sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function
> must be considered separately. In assessing RFC, the adjudicator must discuss the
> individual's ability to perform sustained work activities in an ordinary work
> setting on a regular and continuing basis. . . . The RFC assessment must include
> a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996). The court further

commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-
> by-function assessment based upon all of the relevant evidence of an individual's
> ability to perform work-related activities. . . . The impact of an RFC for less than
> a full range of sedentary work is especially critical for individuals who have not yet
> attained age 50. Since age, education, and work experience are not usually
> significant factors in limiting the ability of individuals under age 50 to make an
> adjustment to other work, the conclusion whether such individuals who are limited

> to less than the full range of sedentary work are disabled will depend primarily on
> the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996).  The court also noted that

SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and

requires that the individual's capacity to do them on a regular continuing basis be stated.  *See id*.

To determine that an claimant can do a given type of work, the ALJ must find that the claimant

can meet the job's exertional requirements on a sustained basis.  *See Carter v. Heckler*, 712 F.2d

137, 142 (5th Cir. 1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

In the case at bar, the ALJ properly accommodated for any limitations resulting from

Mears' alleged impairments by finding in the Residual Functional Capacity ("RFC")

determination that Mears could perform light work, with the ability to lift and/of carry 20 pounds

occasionally and 10 pounds frequently; sit, stand and/or walk for at least six hours in an eight hour

day; occasionally climb stairs, ramps, ladders, ropes, and scaffolds; occasionally stoop and

crouch; and frequently balance, kneel, and crawl.  (R. 14).  In making his RFC determination, the

ALJ considered the limiting effects of all of Mears' impairments that were documented in the

record.  *See* 20 C.F.R. §§ 404.1545, 416.945.  The VE testified that Mears' former job as a

liaison officer was light, semi-skilled work that did not require the performance of work-related

activities precluded by Mears' RFC.  (R. 403-405).

Mears complains that the VE "never expressed to the ALJ the availability of the type of

employment that Mears could perform" and "provided no evidence of the availability of [liaison

work] in the surrounding area."  *See* Docket Entry No. 14, at p. 7.  Mears' complaints are

misplaced.  Because the ALJ determined, at step four, that Mears' RFC did not preclude her from

35

performing her past relevant work as a liaison officer, there was no requirement make an inquiry to the VE regarding the availability of Mears' past relevant work.

The Supreme Court addressed this issue in *Barnhart v. Thomas*, 540 U.S. 20 (2003). The Court accorded deference to the Agency's interpretation that its regulations find that a determination of "no disability" at step four can result without inquiry into whether the claimant's previous work existed in the national economy. *See id.* at 25-28. The Court noted that Agency regulations explicitly reserved that inquiry into the national economy for step five. *See id.* Thus, the Agency has made it clear that it does not interpret the clause "which exists in the national economy" in section 423(d)(2)(A) as applying to "previous work." *See id.* at 25; *see also Leggett v. Chater*, 67 F.3d 558, n.13 (5th Cir. 1995) (holding that an analysis of whether job availability existed was not required when a claimant, like Leggett, was found not to be disabled at step four as opposed to step five). Thus, at step four, the ALJ had no duty to make an inquiry to the VE regarding the availability of Mears' past relevant work.

At step four, Mears had the burden of proving an inability to do her past work. *See Hollis v. Bowen*, 837 F.2d 1378, 1386 (5th Cir. 1988). In this case, Mears failed to demonstrate that she had any condition or combination of conditions that would preclude her from returning to her past relevant work. As such, substantial evidence supports the ALJ's determination that Mears retains the ability to perform her past relevant work.

36

III.     *<u>Conclusion</u>*

_____Accordingly, it is therefore

ORDERED that Mears' Motion for Summary Judgment (Docket Entry No. 14) is **DENIED**. It is further

ORDERED that the Commissioner's Motion for Summary Judgment (Docket Entry No. 15) is **GRANTED**.   It is further

ORDERED that the Commissioner's decision denying Mears disability benefits is **AFFIRMED**.

SIGNED at Houston, Texas, this 10th day of July, 2008.

Calvin Botley
United States Magistrate Judge